UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DEBRA L. AVILA,               )
                             )
                             )
            Plaintiff,        )   CAUSE NO: 2:11-cv-400
                             )
      v.                      )
                             )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                             )
            Defendant.        )

## OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Debra L. Avila, on November 1, 2011. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

## Background

The claimant, Debra L. Avila, applied for Disability Insurance Benefits on February 5, 2008, alleging a disability onset date of December 14, 2006. (Tr. 212-216) Her claim initially was denied on March 26, 2008, and again denied upon reconsideration on May 13, 2008. (Tr. 137-38) Avila requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 154) A hearing before ALJ Marlene R. Abrams was held on July 13, 2010, at which Avila, medical expert Dr. Hilda Martin, and vocational expert Leonard M. Fisher testified. (Tr. 20, 36)

On August 27, 2010, the ALJ issued her decision denying benefits. (Tr. 30) The ALJ found that Avila was not under a disability within the meaning of the Social Security Act from December 14, 2006, through to the date the ALJ issued her decision. (Tr. 29) Following a denial of Avila's request for review by the Appeals Council, she requested an extension of time within which to file a civil action, which was granted. (Tr. 1) Avila filed her timely complaint with this court on November 1, 2011.

Avila was born on July 19, 1960, making her 50 years old on the date of the ALJ's decision. (Tr. 30, 45). She was 5'1" tall and weighed approximately 179 pounds. (Tr. 46, 400) Avila was married and, at the time of the ALJ's decision, resided with her husband, adult son, and two minor grandsons.[1] (Tr. 64, 66) She graduated from high school and completed two years of college as well as various vocational training courses. (Tr. 46)

Avila was last employed in December 2006 as an administrative assistant with the Evangelical Lutheran Church, Inc. (Tr. 48) Avila held this position for approximately seven months prior to quitting because she "could not [sic] longer stand the pain." (Tr. 60) From approximately 1999 to 2004, Avila was employed as an executive administrative assistant for United Methodist, and she then worked as a temporary assistant at Tri-

---

[1] Avila was named the guardian over her two minor grandsons in May 2004, and January 2008, respectively. (Tr. 285-86)

State Metal for three months prior to working for the Lutheran Church. (Tr. 49, 57)

Avila's diagnoses included chronic low back pain; mild sweeping dextroscoliosis to the lumbosacral and lower thoracic spine curvature; lumbar degenerative disc disease; severe disc degeneration; and facet joint arthoropathy, mild disc space narrowing; and left paracentral disc herniation, all at the L5-S1 level. (Tr. 296, 317, 332, 348, 358, 379, 388)

Avila saw her long time treating physician, Kurt J. Giricz, D.O., in September and October 2007 with a cough and congestion and complained of a headache and body aches. (Tr. 321, 323, 324) Dr. Giricz made a diagnosis of bronchitis with a viral upper respiratory infection. (Tr. 321, 323)

On November 17, 2007, Avila returned to Dr. Giricz with complaints of low back pain "on and off for about a year," which she treated with Advil, an over-the-counter medication. (Tr. 319, 320) Avila stated that the pain radiated into her buttocks bilaterally but "not into the thigh or below the knee, or into the calf area." (Tr. 319) Dr. Giricz determined Avila suffered from lumbosacral strain and degenerative arthritis of the lumbar spine. Dr. Giricz prescribed 500mg of Relafen twice daily for ten (10) days and ordered an x-ray of the lumbosacral spine. (Tr. 319) Avila's November 19, 2007 lumbar spine x-ray revealed "mild

sweeping dextroscoliosis to the lumbosacral and visualized lower thoracic spine curvature"; disk space narrowing at L5-S1; and mild posterior facet joint arthritic changes bilaterally at L5-S1 level. (Tr. 325)

Avila saw Dr. Giricz again on December 1, 2007 for a follow-up consultation after her November 19, 2007 x-rays, during which Dr. Giricz discussed treatment options.  Avila declined to initiate injection procedures, but she agreed to begin physical therapy as prescribed by Dr. Giricz.  Avila told Dr. Giricz that she received no relief from the Relafen and took Tylenol PM at night for her symptoms. (Tr. 317)

On December 4, 2007, Avila was evaluated by Mark Stern, P.T., Certified M.D.T. (Tr. 299) Avila complained of pain in the central L5-S1 region and upper gluteal pain on the right.  Avila stated that she had low back pain for about a year, with an increase in pain over the last month. (Tr. 299) Stern's evaluation showed Avila had no myotomal pattern of weakness; was negative for dural signs; demonstrated a minimal loss of extension with all other movement within functional limits; and had a decrease in posterior/anterior mobility of lumbar segments 3, 4, and 5. Stern's assessment stated that Avila's impairments included decreased spinal range of motion, decreased segmental mobility, tenderness to palpation, and pain. (Tr. 300) Stern concluded that

4

Avila's impairments caused functional limitations of decreased tolerance for instrumental activities of daily living and a "decreased ability to tolerate extended periods of community entry activities or any activity in a sustained position;" however, Stern placed no restrictions on Avila's activities. (Tr. 300, 331)

Avila was seen six times for outpatient physical therapy treatment from December 6, 2007 to January 3, 2008. (Tr. 305, 307) She reported "improvement in pain" at her December 20, 2007 therapy session, and "less pain" on January 3, 2008. (Tr. 300-307) Avila did not return to therapy after January 3, 2008, and she was discharged on February 6, 2008. (Tr. 307)

On February 4, 2008, Avila returned to Dr. Giricz with complaints of occasional discomfort and pain in the lumbosacral area that stopped at the right buttock. Avila stated that her pain endured for a "relatively short period of time" and generally was resolved by the next day after treating it with Tylenol PM. (Tr. 315) Avila assessed her pain at a 1 on a scale of 1 to 5 on that date.

On March 25, 2008, state agency physician Dr. B. Whitley, M.D., completed Avila's Physical Residual Functional Capacity Assessment pursuant to his review of evidence as provided by the Social Security Administration. (Tr. 332-340) Dr. Whitley's

assessment concluded that Avila could lift and/or carry 20 pounds occasionally; could lift and/or carry 10 pounds frequently; could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; and could push and/or pull with no restrictions other than as shown for lift and/or carry. (Tr. 333) Dr. Whitley's report further established that Avila could climb ramps and stairs frequently, that she never could use ladders, ropes, or scaffolds, that she had no manipulative, visual, or communicative limitations, but that she should avoid hazards such as machinery or heights. (Tr. 334-336) Dr. Whitley determined that Avila's contentions regarding the nature of her impairments and limitations were supported within the medical and other evidence in the file. However, her contentions regarding the severity of her symptoms and the related functional restrictions were not supported. (Tr. 337)

In support of his conclusions, Dr. Whitley's report described Avila's medical conditions and limitations as follows: Lumbar facet arthropathy with pain in the lower right back that did not extend below the right buttock; no pattern of weakness; +2 sensation and deep tendon reflexes; negative for dural signs; some decrease of range of motion of L-spine; and pain which was relieved with medication. (Tr. 333). Dr. Whitley's Physical Residual Functional Capacity Assessment form was affirmed by Dr.

Fernando R. Montoya, M.D., on May 8, 2008, who noted that light RFC seemed appropriate. (Tr. 340)

On April 28, 2008, Dr. Giricz examined Avila and found that her area of pain was about 15-20 cm in diameter in the lumbar area and paraspinal lumbar musculature and was mainly in the right lumbosacral joint at L5-S1. (Tr. 354) Dr. Giricz noted that Avila was sent to physical therapy without success; was unable to sit for lengthy periods of time; had to get up or lie down a couple of times a day; and was limited in her activities. Dr. Giricz referred Avila to Dr. Ravi Kanakamedala for a pain management consultation with a plan to return to his office for follow-up and treatment. (Tr. 354) On the same date, Dr. Giricz completed a Medical Assessment of Ability To Do Work-Related Activities and concluded that, during an eight-hour work day, Avila could lift less than five pounds; could stand for less than one hour and sit for less than 30 minutes; required two periods of rest (under 30 minutes) in a reclined position; never could climb, balance, stoop, crouch, kneel, or crawl; and was restricted by pain from pushing/pulling. Dr. Giricz's report further established that Avila had to avoid heights and moving machinery and indicated that Avila experienced pain with long periods of sitting, had failed at physical therapy attempts, and was unable to pursue gainful employment. (Tr. 342-345)

On January 24, 2009, Avila returned to Dr. Giricz for evaluation of her persistent, chronic low back pain. Dr. Giricz noted that Avila was taking over-the-counter, non-steroidal anti-inflammatory drugs without much benefit.  He prescribed Relafen, 500 mg twice a day, and recommended pain management consultation for an injection procedure for her facet arthropathy.

On January 29, 2009, Dr. Kanakamedala examined Avila and administered diagnostic medial branch blocks of bilateral L3, L4, and L5 under fluoroscopy. (Tr. 377-380) Dr. Kanakamedala's physical examination revealed tenderness upon palpation at L4-L5, facet joint tenderness at L4-L5 and L5-S1 bilaterally, and pain upon extension and rotation bilaterally, with painful extension at 10 degrees. (Tr. 378)  Avila's heel and toe walking was normal, and Dr. Kanakamedala found no muscle or sacroiliac joint tenderness. (Tr. 378-79)  A sensory exam was normal, and both a Straight Leg Raising Test and Patrick's Test were negative. (Tr. 379)

On January 31, 2009, a lumbar spine MRI revealed large left paracentral disc herniation at L5-S1, displacing the left S1 nerve root to the left side. (Tr. 346-47) On February 12, 2009, Avila saw an orthopaedic surgeon, Dr. Purnendu Gupta, M.D., for back and leg pain and bilateral numbness in her toes. (Tr. 387) Upon examination, Dr. Gupta noted a normal gait, good strength

with heel and toe walking, and pain localized in the lumbosacral region. (Tr. 388) Upon sitting, Avila had painless bilateral hip range of motion with a negative straight leg raise and cross leg raise sign. On supine examination, Avila had painless bilateral hip range of motion, a negative straight leg raise and cross leg raise sign, and a negative Patrick's test bilaterally. (Tr. 388) Avila's history was significant for weight gain, and she indicated that she was taking Relafen with no relief and suffered stomach upset with Codeine and Vicodin. (Tr. 387) Dr. Gupta diagnosed Avila with central and left sided L5-S1 disc herniation and L5-S1 severe disc degeneration, and he recommended that Avila refrain from any bending, twisting, or lifting. Dr. Gupta further recommended that Avila proceed with an epidural steroid injection and possibly a lumbar decompression and instrumented fusion if the epidural steroid injection failed. (Tr. 388)

On February 26, 2009, a physical examination by Dr. Kanaka-medala revealed mild distress and a mild decrease in lordosis. An MRI was ordered because the Facet Diagnostic Medial Branch Blocks did not provide relief. (Tr. 356) A bilateral S1 transfor-aminal epidural steroid injection was administered. (Tr. 362)

Avila returned to Dr. Kanakamedala on June 11, 2009, and stated that she had relief from the February 26, 2009 epidural injection but that pain had returned to her lower back over the

past two to three weeks.  Avila requested a repeat injection stating that she "cannot live with the current pain."  She had no loss of muscle strength and no loss of bladder or bowel function. (Tr. 403) Dr. Kanakamedala performed a physical examination which revealed that Avila was in no distress.  Her gait was unchanged, and she had no tenderness over her spinous processes or facet joints.  Her reflexes and motor strength were unchanged, and her range of motion was noted to be decreased with flexion. A second epidural steroid injection was administered at S1 bilaterally. (Tr. 404)

On July 30, 2009, Avila saw Dr. Gupta with 100% stabbing back pain that was worse with sitting, standing, and walking. Dr. Gupta noted that Avila could walk one mile and denied any leg pain. (Tr. 391) Upon physical examination, Dr. Gupta remarked that Avila had a normal gait and good strength with heel and toe walking.  On forward bending, she could touch her mid tibias.  On sitting examination, she had painless bilateral hip range of motion with a negative straight leg raise and cross leg raise sign. Her sensation was intact bilaterally in her L1 through S1 dermatomes.  On supine examination, she had painless bilateral hip range of motion and a negative supine straight leg raise and cross leg raise sign.  She had a negative Patrick's test bilater-ally. (Tr. 391) Dr. Gupta felt that Avila had "some steady

symptoms" and was concerned whether the disc disease was pro-
gressing at L5-S1. He concluded that Avila's disc herniation was
not the issue and recommended that Avila re-address physical
therapy and her weight, begin low impact aerobic activity with an
anti-inflammatory, and possibly a radiofrequency deafferentation.
Dr. Gupta further recommended that Avila follow up with her pain
management doctor.

On April 12, 2010, Dr. Giricz completed a second Medical
Assessment of Ability To Do Work-Related Activities and concluded
that during an eight-hour work day, Avila could lift less than
five pounds; could stand/walk or sit for less than 30 minutes;
never could climb, balance, stoop, crouch, kneel or crawl; should
avoid heights and moving machinery; required more than two
periods of rest in a reclined position for about 30 minutes to
one hour; and required a cane for stability. Dr. Giricz cited
Avila's disc herniation at L5-S1 as the cause of these restric-
tions. (Tr. 392-394) Dr. Giricz's notes on that date indicated
that Avila additionally complained of numbness and paraesthesias
in both of her hands extending to her upper forearms, that she
had an element of positive Tinel's sign bilaterally, and that she
had some pain on straight leg raising bilaterally. Dr. Giricz
further stated that Avila was able to ambulate independently but
that Avila told him that she used a cane periodically. His

impression was of bilateral carpal tunnel syndrome and herniated nucleus pulposus at L5-S1, and he recommended an EMG and nerve conduction study of the bilateral upper and lower extremities. Dr. Giricz further noted that Avila might not be able to meet the financial burden for this testing. (Tr. 396)

At the hearing before the ALJ, Avila testified that she stopped working as an administrative assistant for United Methodist on December 14, 2006, because of increasing back pain. (Tr. 47, 60) She was able to perform all of her personal grooming activities, but it took her longer and sometimes she had to perform them in increments. (Tr. 65) Avila estimated that she could sit for ten to 20 minutes at a time and up to 30 minutes on a good day. (Tr. 68) She stated that she felt anxious, "like she wanted to go off and walk" and that her legs fell asleep. (Tr. 68) Avila could stand for up to 30 minutes and admitted that she cooked 75% of the time for her family, shopped with her husband, and drove occasionally. (Tr. 66, 68-69, 74) Avila was able to perform household chores daily at a slow pace and in increments. Her grandchildren assisted her with chores and with the laundry. (Tr. 72, 78) She needed to use her hands to help her to get up, sit down, or lay down, and she took two 30 minute naps each day to alleviate the pain in her back. (Tr. 65, 74)

Avila further testified that she experienced a recent onset of tingling in her hands and arms and that her arms would fall asleep, making it difficult to be accurate while typing and causing her to drop things involuntarily. (Tr. 79-80, 82) Her family doctor suggested that she get an EMG to see if she had carpel tunnel syndrome, however, she could not afford the test. (Tr. 80) Avila also had become forgetful, which made her afraid to take "the heavier narcotic medications." (Tr. 75)

Avila stated that she had not taken any prescription medications for six months prior to her ALJ hearing, claiming that her prescribed medications caused nausea and made her dizzy. (Tr. 73) At the time of the hearing, Avila was taking Advil or Tylenol in the mornings and Tylenol PM at night to manage her pain. (Tr. 71-72)

Dr. Hilda Martin, a board certified internist and pulmonologist, testified at the hearing as a medical expert ("ME"). (Tr. 39, 83) Dr. Martin confirmed that she reviewed all of Avila's records and stated that lumbar spine pain was the leading medically determinable impairment that caused Avila to suffer more than a minimal functional limitation. (Tr. 83, 84) The ME opined that Avila had no radiculopathy and agreed with Dr. Gupta's July 30, 2009, assertion that Avila's disc herniation was not a factor that contributed to any functional limitations. (Tr. 84-85) The

ME concluded that a diagnosis of degenerative disc disease and facet arthritis was supported by the evidence but that Avila's pain was not severe until after February 4, 2008. (Tr. 92, 93)

Based upon her review of the record, the ME concluded that Avila could lift 20 pounds occasionally and 10 pounds frequently. (Tr. 103) Avila could sit for four hours within an eight hour workday and could stand or walk for four hours. However, she would need to stand and sit and walk intermittently and would need to be able to change positions and to alternate sitting and standing every half-hour to one hour. (Tr. 85, 103, 109) Avila occasionally could bend, stoop, crouch, kneel, and climb ramps or stairs, but she should not climb ropes at all. (Tr. 104) The ME found no evidence to support any manipulative limitations, but she stated that Avila should avoid any concentrated exposure to uneven or slippery surfaces. (Tr. 105)

Vocational Expert ("VE") Dr. Leonard Fisher was the last to testify at the hearing before the ALJ. (Tr. 114) The VE defined Avila's past work, an administrative assistant, as a skilled job performed at a medium exertional level but having a Dictionary of Occupational Titles ("DOT") designation of sedentary exertional level. (Tr. 114-116) He defined Avila's past work in customer service at Tri-State Metal as semi-skilled at the higher level with a light exertional level. (Tr. 57, 117)

The ALJ then posed a series of hypothetical questions. (Tr. 117-123) First, the ALJ asked whether a person of Avila's age, education, and work experience, who was able to perform the full range of light exertional level work, occasionally could kneel, crouch, and crawl, but never could climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to machinery and heights, could perform any of Avila's past work. (Tr. 118) The VE responded that a person, as described, could perform either of Avila's previous jobs in customer service or as an administrative assistant.

The ALJ's second hypothetical asked whether an individual who was able to perform the full range of light exertional level work, occasionally could climb ramps or stairs, stoop, crouch, crawl, kneel, or bend, but never could climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to machinery and heights as well as uneven and slippery surfaces, could perform any of Avila's past work. (Tr. 118-19) The VE stated that with the modification, Avila's past work as either an administrative assistant or in customer service could be performed but that the administrative assistant job could not be performed as Avila performed it.

The ALJ's third hypothetical assumed a person of Avila's age, education, and work experience, who could lift 20 pounds

occasionally and ten pounds frequently, could stand and walk up to six hours, could sit two to four hours, occasionally could climb stairs or ramps, bend, stoop, crouch, and crawl, but never could climb ladders, ropes or scaffolds, and must avoid concentrated exposure to machinery and unprotected heights as well as uneven and slippery surfaces. (Tr. 119) The VE responded that, under those circumstances, Avila could not perform her past work but that she had transferable skills and could work as a teller in a financial institution (16,000 regional jobs/492,000 national), which was a light job with a skilled level of 5. (Tr. 120)

The fourth hypothetical the ALJ posed assumed all of the same factors and limitations as the third, with the additional limitation of a required stand/sit option, for which the hypothetical person had to get up every hour for five minutes. (Tr. 120) The VE opined that, with the added stand/sit option, Avila would be able to perform work as a teller (16,000 regional jobs/ 492,000 national), a general office clerk (74,000 regional jobs/ 2.9 million national), or a file clerk (5,200 regional jobs/ 264,000 national). (Tr. 121)

In her fifth hypothetical, the ALJ asked whether Avila could perform her past work assuming she could lift 20 pounds occasionally and ten pounds frequently; could stand and walk up to four

hours a day; could sit up to four hours a day, but with a re-
quired stand/sit option, for which she had to get up every hour
for five minutes; occasionally could climb stairs or ramps, bend,
stoop, crouch, and crawl, but never could climb ladders, ropes,
or scaffolds; and had to avoid concentrated exposure to machinery
and unprotected heights as well as uneven and slippery surfaces.
The VE replied that the additional restrictions would eliminate
her past work and the file clerk job but that Avila still could
perform as a teller or general office clerk. (Tr. 121)

Avila's attorney assumed the ALJ's fourth and fifth hypo-
theticals and asked if it would make a difference if, for the
sit/stand option, the person had to walk around for five minutes.
(Tr. 123-125) Although the VE previously had ruled out Avila's
prior job as an administrative assistant, when her attorney added
the walking around requirement, he stated that the additional
requirement would not rule out teller or administrative assistant
jobs, as they could typically walk as part of their job.  He went
on to add that one would have to walk around within their work
space. (Tr. 125) If a person were off task and away from the work
station in order to walk around for five minutes every hour, or
40 minutes per day, that would be accommodated employment, not
competitive employment. (Tr. 130) However, the VE concluded that
as a teller, Avila could exercise a stand/sit option that re-

quired walking around for five minutes each hour without having to be off task.  (Tr. 125-127)

Finally, Avila's attorney clarified that Avila performed data entry and not budgeting as assumed by the VE when he indicated that she had transferable skills to perform the work of a teller. (Tr. 131-32) The VE responded that, even if the budgeting skill was removed, Avila still held sufficient transferable skills and his opinion would not change. (Tr. 133)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 21-22) At step one, the ALJ determined that Avila had not engaged in substantial gainful activity since the alleged onset date of December 14, 2006. (Tr. 22) At step two, the ALJ found that Avila had the following severe impairments: Discogenic lumbar spine pain, L5-S1 herniated disc, facet joint arthritis in L5-S1, and degenerative disc disease of the lumbar spine.  (Tr. 22) The ALJ additionally noted that, although there was no specific level of weight or BMI that equated obesity as a "severe" or a "not severe" impairment, she performed an individualized assessment and determined that Avila's obesity was severe. (Tr. 23)  At step three, the ALJ found that Avila's impairments, or combination thereof, did not meet or medically equal one of the listed impairments.  In particular, the ALJ noted that the

medical evidence failed to establish that Listing 1.04, Disorders of the Spine, was met or medically equaled and that Avila's obesity did not satisfy the requirement of any listed impairment. (Tr. 23)

In determining Avila's residual functional capacity (RFC), the ALJ stated that she considered the entire record, all of Avila's symptoms, and the extent to which Avila's symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Tr. 24) The ALJ found that Avila had the capacity to perform light work as defined in 20 C.F.R. §404.1567(b), and she determined that Avila could carry objects up to 20 pounds occasionally and ten pounds frequently; could stand/walk each for about six hours in an eight hour workday; and sit for at least two hours in an eight hour workday, with the opportunity to alternate between sitting and standing every hour for about five minutes. (Tr. 24) She further found that Avila occasionally could stoop, kneel, crouch, crawl and bend, but that she could not climb ropes, ladders, or scaffolds. The ALJ further determined that Avila should avoid concentrated exposure to hazards such as machinery, unprotected heights, and uneven or slippery surfaces. (Tr. 24)

In reaching this determination, the ALJ first discussed Avila's allegations that her ability to work was limited due to

degenerative disc disease and arthritis in her spine. (Tr. 24)
Avila had testified that she stopped working at her last place of
employment because severe back pain prevented her from performing
her job duties, which consisted of about 40% computer use and 60%
walking and completing errands.  Avila further had alleged that
her impairments adversely affected her ability to sit or walk for
long periods as this produced considerable pain in her back.  She
could not lift anything heavy and could not sit/stand/walk for an
eight-hour shift.  It was difficult for her to bend at the waist,
and she rated her pain as an 8 on a 0-10 pain scale, with 0 being
the least severe and 10 being the most severe.  Avila had as-
serted that her pain did not respond to medial branch block
injections or transforaminal epidural steroid injections per-
formed on January 29, 2009, February 26, 2009, and June 11, 2009.
(Tr. 24)

The ALJ next observed Avila's claims that she had difficulty
using her arms and hands, including recent incidents of dropping
items from her hands because of numbness and weakness.  Avila
also had alleged that she had a tingling sensation in her legs.
The ALJ pointed out that carpal tunnel syndrome (CTS) had not
been medically diagnosed and that the ME testified that there
were no objective findings to support such a diagnosis. (Tr. 24)

The ALJ then discussed Avila's claims of forgetfulness, remarking that, as with her claims of CTS, her claims of forgetfulness were not reported when she filed her application for disability.  (Tr. 25) The ALJ additionally noted that there were no recorded observations by Social Security Administration employees asserting that Avila experienced difficulties while she was completing or filing the necessary forms.  Additionally, the SSA interviewer reported that Avila had no noticeable difficulties with understanding, coherence, or concentration during her telephone interview with the SSA Field Office.  The ALJ further noted that the record reflected no treatment for this alleged impairment.  (Tr. 25)

The ALJ concluded that Avila's medically determinable impairments reasonably could be expected to cause the alleged symptoms.  However, Avila's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment. (Tr. 25) The ALJ reasoned that, despite severe pain allegations, Avila neither had been prescribed nor had taken any narcotic based pain relieving medications and that Avila had testified that she currently was taking over-the-counter Advil and Tylenol PM.  The ALJ took notice of Avila's reports that medications made her dizzy and

nauseous, but the ALJ stated that the record indicated, gener-
ally, that the side effects were mild and would not interfere
with Avila's ability to work. (Tr. 25)

The ALJ then explained that the daily activities described
by Avila were not limited as would be expected given her com-
plaints of disabling symptoms and limitations.  Avila could cook,
clean house, and do laundry. (Tr. 25) She cooked for her family
75% of the time, grocery shopped with her husband, and could
drive a car. (Tr. 25, 26) She used her hands to help her with
everything, and on a "good day," Avila could sit for 20-30
minutes continuously and stand for 30 minutes. (Tr. 25, 26) The
ALJ then pointed out that Avila initially did not admit that she
had custody of her two grandchildren and described Avila's later
admission regarding custody of her grandchildren as "reluctant"
and having been made "after looking at her counsel."  The ALJ
further asserted that Avila continually looked at her counsel
prior to responding to questions and looked at documents that her
counsel placed before her during her testimony. (Tr. 26) The ALJ
noted that during the hearing Avila bent over the side of her
chair and lifted her "rather large" purse from the floor.  Avila
also was able to get up from her chair with no apparent diffi-
culty. (Tr. 26)

Next, the ALJ went on to state that the objective medical evidence did not support the severity of Avila's subjective complaints and that the evidence of record established that Avila had pain in the lower back that did not radiate past the buttock and was relieved with medication. (Tr. 26, 28) The record additionally reflected that Avila had shown no pattern of weakness, had +2 sensation, and had negative straight leg raises. The ALJ gave great weight to and adopted the opinion of the non-examining state agency medical expert, Dr. Hilda K. Martin, stating that Dr. Martin's opinions were "the most informed, convincing, consistent with the medical evidence, and consistent with the record as a whole." (Tr. 28) The ALJ also gave the opinion of non-examining state agency medical consultant Dr. B. Whitley some weight because "it generally comports the totality of the record, as well as the opinion of the medical expert." (Tr. 27)

The ALJ gave minimal weight to the opinions of Avila's treating physician, Dr. Kurt Giricz, stating that his opinions were "quite conclusory, proving very little explanation of the evidence relied on in forming [them], and very few, if any, objective clinical findings were mentioned or referenced." (Tr. 27)

With the RFC determined, at step four the ALJ considered the physical and mental demands of a secretary/administrative assistant position and determined that Avila was capable of performing her past relevant work as it was performed generally in the economy through the date last insured.[2] (Tr. 29) The ALJ concluded by stating that, even if Avila's RFC was more restrictive and limited to standing/walking about four hours a day and sitting to four hours a day, Avila still could perform a significant number of jobs available in the national economy including teller (492,000 jobs), general office clerk (2.6 million jobs), and file clerk (264,00 [sic] jobs). (Tr. 29)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as

---

[2] Although the ALJ stated that Avila was "capable of performing her past relevant work through the date last insured" Avila's uncontested last insured date was December 31, 2011 — approximately 16 months past the date of the ALJ's decision.

24

a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852, (1972) (*quoting* *Consolidated Edison Company v. NLRB*,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See
also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v.
Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision
must be affirmed if the findings are supported by substantial
evidence and if there have been no errors of law. *Rice v. Barn-
hart*, 384 F.3d 363, 368—69 (7th Cir. 2004); *Scott v. Barnhart*,
297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot
stand if it lacks evidentiary support or an adequate discussion
of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available
only to those individuals who can establish "disability" under
the terms of the Social Security Act. The claimant must show that
she is unable "to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impair-
ment which can be expected to result in death or which has lasted
or can be expected to last for a continuous period of not less
than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security
regulations enumerate the five-step sequential evaluation to be
followed when determining whether a claimant has met the burden
of establishing disability. 20 C.F.R. §404.1520, §416.920. The

ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c), §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national

economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

Avila criticizes the ALJ's opinion on several grounds, including that the ALJ erroneously assigned significant weight to the opinion of the ME and improperly disregarded the opinion of Avila's treating physician, and that she failed to consider all of Avila's claimed impairments in determining her RFC, which resulted in erroneous step four and step five findings. Avila further contends that the ALJ incorrectly evaluated her credibility.

Avila first attacks the qualifications of Dr. Martin, the ME, alleging that the ALJ erred by affording significant weight to her opinion because the ME was retired from practicing medicine, specialized in pulmonology as opposed to diseases of the spine, and lacked experience to interpret lumbar spine x-rays or to comment on Avila's diagnosis of CTS. Avila, however, did not object to Dr. Martin's qualifications as an expert at the ALJ hearing. Instead, she stipulated to the ME's qualifications and is raising her objection for the first time on appeal.

A claimant must protect her own interests by objecting to the qualifications of an ME at the administrative hearing. *Kepple v. Apfel*, 2000 WL 1810090, *12 (N.D. Ill. Dec. 8, 2000) *aff'd sub nom*. *Kepple v. Massanari*, 268 F.3d 513 (7th Cir. 2001)

(finding that claimant's assertions that ME was not qualified to give an opinion about the medical evidence failed when the claimant, who was represented by counsel, failed to raise this assertion before the ALJ). *See also*, ***Ragsdale v. Shalala***, 53 F.3d 816, 819 (7th Cir. 1995)("[Claimant's] failure to protect his own interests below cannot constitute a sufficient ground for us to cast aside a prior opinion"); ***Skinner v. Astrue***, 478 F.3d 836, 842 (7th Cir. 2007)("[A] claimant represented by counsel is presumed to have made his best case before the ALJ.").

In examining the district court's opinion in ***Kepple***, the Seventh Circuit declined to address the district court's finding as to waiver and affirmed on other grounds. Nevertheless, the Seventh Circuit specifically noted the First Circuit's position that an issue is waived when the claimant fails to present it at the ALJ hearing. ***Kepple***, 268 F.3d at 516 (*citing* ***Mills v. Apfel***, 244 F.3d 1, 8 (1st Cir. 2001)). The Seventh Circuit reached a similar conclusion in ***Logan v. Barnhart***, 72 Fed.Appx. 488, 491 (7th Cir. 2003), finding that "[b]ecause [claimant] is raising these issues for the first time on appeal, she has probably forfeited them." ***Logan***, 72 Fed.Appx. at 491. Avila was repre-sented by counsel and failed to object at the hearing, instead stipulating to the qualifications of Dr. Martin. The court finds

that Avila's present objection is untimely and does not provide grounds for remand.

Avila next alleges that the ALJ erred in adopting the opinion of the state agency's consulting ME, Dr. Martin, and giving minimal weight to the assessment of her treating physician, Dr. Giricz.  With regard to the nature and severity of a claimant's medical condition, her treating physician's opinion is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (*citing Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).  An ALJ may discount a treating physician's medical opinion when it is internally inconsistent or inconsistent with a consulting physician's opinion if she has articulated, at lease minimally, her analysis of the evidence so this court can follow her reasoning. *Skarbek*, 390 F.3d at 503; *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ concluded, consistent with Dr. Martin's opinions, that Avila frequently could lift and/or carry 10 pounds; occasionally lift and/or carry 20 pounds; stand/walk, each for about six hours in an eight hour workday; and sit for at least two hours in an eight hour workday, with the opportunity to alternate between sitting and standing every hour for about five minutes;

could not climb ropes, ladder, or scaffolds; occasionally could stoop, kneel, crouch, crawl and bend; and should avoid concentrated exposure to machinery, unprotected heights, and uneven and slippery surfaces. The ALJ rejected Dr. Giricz's Medical Source Statements which concluded that Avila could lift/carry less than five pounds and could stand, walk, and sit for less than 30 minutes total in an eight hour day.

In her opinion, the ALJ sufficiently articulated her reasons for adopting the reviewing physician's opinion over that of Dr. Giricz. As the ALJ explained, she found Dr. Martin's opinions to be "the most informed, convincing, consistent with the medical evidence, and consistent with the record as a whole." In rejecting Dr. Giricz's opinions, the ALJ explained that they were conclusory and provided very little explanation of the evidence relied upon in forming them. Additionally, Dr. Giricz failed to mention or to reference sufficient, if any, objective clinical findings to support the limitations he placed on Avila.

The ALJ's decision not to afford controlling weight to the opinions of Avila's treating physician was further justified by the inconsistencies between Dr. Giricz's opinions and other substantial evidence in the record. *See* 20 C.F.R. §404.1527(d)(2). *See also* **Clifford**, 227 F.3d at 870 ("A treating physician's opinion regarding the nature and severity of a medical condition

is entitled to controlling weight *if* it is well supported by medical findings and not inconsistent with other substantial evidence in the record")(emphasis added).

Contrary to Dr. Giricz's opinion that Avila could stand/sit for only 30 minutes total in an eight hour work day, the ALJ pointed out that Avila testified that she could perform all of her personal grooming activities daily, cooked for her family 75% of the time, and could stand up to 30 minutes at a time. She also testified that she could sit for up to 30 minutes at a time on a good day. Avila further testified that, at the time of the ALJ hearing, she was taking no prescription drugs for pain, only Advil or Tylenol in the mornings, and Tylenol PM at night. Additionally, the record showed that despite Avila's complaints of pain on June 11, 2009, Dr. Kanakamedala noted that Avila's gait was unchanged, that she admitted to taking less medication since receiving a steroid injection four months prior, and that she did not appear to be in distress.

Also adverse to Dr. Giricz's opinion were the findings and diagnoses of orthopaedic surgeon Dr. Gupta, which Dr. Martin relied upon in forming her opinion. After examining Avila on July 30, 2009, Dr. Gupta reviewed Avila's lumbar spine MRI and acknowledged Avila's disc herniation. However, he concluded that it was not a factor which contributed to any functional limita-

tions and that Avila was in fact able to walk for one mile. At that time, Dr. Gupta imposed no restrictions upon Avila and instead recommended that she consider low impact aerobic activity. Dr. Martin's reliance on Dr. Gupta's observations and findings not only evidences that her opinion was well supported by the record but also refutes Avila's assertion that Dr. Martin did not consider Avila's lumbar spine MRI in forming her opinion.

Avila alternatively asserts that Dr. Martin's opinion was flawed because it "disregarded" Dr. Giricz's finding that Avila had "some pain on straight leg raising bilaterally," claiming that this finding by Dr. Giricz was conclusive of radiculopathy. Avila ignores the fact that Dr. Giricz's reports and findings were largely inconsistent with the bulk of the evidence submitted. Unlike Dr. Giricz, Dr. Martin formed her opinion by relying on the objective findings of Dr. Gupta and other reported negative straight leg raise tests within the record. Additionally, in rejecting Dr. Giricz's statement, Dr. Martin explained that it was "very nebulous" because it did not contain language typically used by doctors in describing results of a straight leg test. Therefore, it was reasonable for Dr. Martin to discount Dr. Giricz's report because it was unclear and inconsistent with the rest of Avila's medical records.

Contrary to Dr. Giricz's opinions, and as the ALJ pointed out, Dr. Martin's opinions were well supported within the record as submitted by Avila. To that end, the ALJ was justified in not assigning controlling weight to the opinions of Dr. Giricz.

Avila also contends that the ALJ erred by not ordering a consultative examination of Avila pursuant to 20 C.F.R. §404.1517, and alternatively, that the ALJ was obligated to re-contact Dr. Giricz before discrediting his opinions. Avila exaggerates the required duties of an ALJ. 20 C.F.R. §404.1517 permits the ALJ to ask the claimant to submit to a medical examination at the agency's expense. It contains no language that requires the ALJ to provide support for a treating physician's opinions where it is lacking. The ALJ does have a duty to obtain a complete record, but this requirement is not as extensive as Avila would like the court to believe. It always would be possible to obtain another examination or consultation. The determination of when a record is complete is left to the ALJ's discretion. ***Scheck v. Barnhart***, 357 F.3d 697, 702 (7th Cir. 2004) ("As this court noted in ***Kendrick v. Shalala***, . . . Taking 'complete record' literally would be a formula for paralysis.'" (*quoting* ***Kendrick v. Shalala***, 998 F.2d 455, 456 (7th Cir. 1993)). A lack of evidence can be indicative of a failure to support a

claim and not demonstrative of an inadequately developed record. *Simila v. Astrue*, 573 F.3d 503, 516—17 (7th Cir. 2009).

The ALJ also was not required to re-contact Dr. Giricz for additional evidence because she determined his opinions lacked support. An ALJ need not re-contact medical sources unless the evidence received is insufficient to determine whether the claimant is disabled. *Skarbek*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the evidence was adequate for the ALJ to find Avila not disabled, and the ALJ acted within her discretion in deciding neither to order an additional examination of Avila nor to re-contact Dr. Giricz.

Avila next asserts that the ALJ erred in failing to incorporate all of her claimed impairments into her RFC determination and that, as a result, her step four and step five findings were erroneous.

Although the ALJ found at step two that Avila suffered from four severe impairments, Avila contends that the ALJ erred by failing to include her claimed hand limitations and obesity into her RFC determination. An injury or condition is a severe impairment if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c), §416.920(c); *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). Avila points to nothing in the record

that supported a finding that any condition or injury not mentioned by the ALJ met that standard.

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.  (footnote omitted)

> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what she must articulate in her written decision.  "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions."  *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir.

2008) (*quoting* **Clifford**, 227 F.3d at 863). Nevertheless, when the evidence conflicts regarding the extent of the claimant's limitations, the ALJ must examine both the evidence favoring the claimant and the evidence that supports a claim's rejection. *See* **Zurawski v. Halter**, 245 F.3d 881, 888 (7th Cir. 2001) (*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.")(emphasis in original).

In evaluating evidence in support of Avila's claim that she had limited use of her hands, the ALJ noted that Avila had not received treatment nor had she pursued low income healthcare options. Avila asks the court to consider her testimony that she had limited use of her hands, however, as will be discussed more thoroughly below, the ALJ did not find Avila's complaints credible. *See* SSR 96-7p at *7 (explaining that evidence that the claimant's level or frequency of treatment is inconsistent with the level of complaints can support an adverse credibility finding). However, the ALJ must explore the claimant's explanations before drawing any inference from this failure, because the claimant's explanation, for example, that she cannot afford treatment, can "provide insight into the individual's credibil-

ity". SSR 96-7p at *7. *See also* **Craft v. Astrue**, 539 F.3d 668, 679 (7th Cir. 2008)("An in- ability to afford treatment is one reason that can 'provide in- sight into the individual's credi- bility.'")(*quoting to* SSR 96-7p).

Although the ALJ drew a negative inference as to Avila's credibility from her failure to pursue a definitive diagnosis or treatment of her claimed hand limitations, she first questioned Avila as to whether she could afford the tests as well as whether her husband was employed full time and covered her under his medical insurance. The ALJ then pointed to Avila's own testimony regarding her daily activities to discredit her allegations of limitations in fine and gross hand manipulation. It is clear from the ALJ's decision that she considered the evidence both in favor of and against Avila's claims, but ultimately found them not credible.

With regard to Avila's obesity, the ALJ correctly asserted in her opinion that there was no definite level of weight or BMI measurement that equates with a severe or not severe impairment. SSR 02-1P at *2. Nevertheless, the ALJ stated in step 3 of her opinion that she "performed an individualized assessment and considered any additional and cumulative effects" of Avila's obesity on her functioning without any explicit analysis.

If a claimant is obese, the ALJ must consider the "incremental effect" of obesity on the claimant's limitations. ***Gentle v. Barnhart***, 430 F.3d 865, 868 (7th Cir. 2005). Even if a claimant does not contend that obesity is one of her impairments, SSR 02—1p requires an ALJ to consider the effects of obesity on the claimant's other conditions. However, failure to consider these effects explicitly can be "harmless error." ***Prochaska v. Barnhart***, 454 F.3d 731, 736 (7th Cir. 2006). The Seventh Circuit in ***Prochaska*** found that the ALJ "sufficiently analyzed" the claimant's obesity by implicitly considering the issue, in part by relying on medical documents that noted the claimant's height and weight. Additionally, because Prochaska did not specify how obesity specifically impaired her work ability, the Seventh Circuit found that any error on the ALJ's part by not explicitly considering the claimant's obesity was harmless. ***Prochaska***, 454 F.3d at 737. *See also **Skarbek***, 390 F.3d at 504 (finding that the ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity, plus claimant's failure in specifying how weight impaired the ability to work, was harmless error).

Here, the ALJ did consider and address the effects of Avila's obesity on her medical condition and her ability to work. In step 3, the ALJ found that Avila was obese and that her obesity was a severe impairment. In step 4, the ALJ explicitly

stated that she had evaluated Avila's obesity in conjunction with her other impairments and determined that Avila did not have an impairment or combination of impairments that met or equaled an impairment listed in the regulations. Further, the ALJ gave great weight to the opinion of the ME who reviewed Avila's medical records, including Dr. Gupta's reports of her obesity and his recommendation that she lose weight and participate in low impact aerobic activity. The ALJ also adopted the limitation suggested by the ME, who was aware of Avila's back pain as well as the fact that she recently had gained weight because both were mentioned in her various medical records. As in *Prochaska*, Avila's medical charts, as contained in the record and reviewed by both the ME and the ALJ, noted Avila's height and weight. Accordingly, the ALJ sufficiently analyzed the issue of Avila's obesity by implicitly considering it when adopting the ME's opinion which took into account Avila's obesity and the effect it may have had on her other conditions. Therefore, the ALJ did not fail to consider the effects of Avila's obesity as the claimant alleges.

Because the court finds that the ALJ did not error in formulating her RFC determination, the court need not address Avila's claims that a faulty RFC determination created errors in steps four and five.

Finally, Avila contests the ALJ's finding that her testimony was not entirely credible, alleging that the ALJ did not adhere to the requirements of SSR 96-7 and 20 C.F.R. §404.1529. Specifically, Avila asserts that the ALJ's credibility determination is flawed because it discredited Avila's testimony because it was unsupported by objective evidence, failed to consider Avila's claimed side effects from narcotic pain medications, and improperly evaluated the manner in which Avila carried out her daily activities.

This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska*, 454 F.3d at 738 ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations

rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck*, 357 F.3d at 703. If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely

ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p at *1. *See also* **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004); **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather,

> [i]f the allegation of pain is not supported
> by the objective evidence in the file
> and the claimant indicates that pain is a
> significant factor of his or her alleged
> inability to work, then the ALJ must obtain
> detailed descriptions of claimant's daily
> activities by directing specific inquiries
> about the pain and its effects to the claim-
> ant. She must investigate all avenues pre-
> sented that relate to pain, including claim-
> ant's prior work record information and
> observations by treating physicians, examin-
> ing physicians, and third parties. Factors
> that must be considered include the nature
> and intensity of claimant's pain, precipita-
> tion and aggravating factors, dosage and
> effectiveness of any pain medications, other
> treatment for the relief of pain, functional
> restrictions, and the claimant's daily acti-
> vities. (citations omitted)
>
> **Zurawski**, 245 F.3d at 887 (*citing* **Luna v.
> Shalala**, 22 F.3d 687, 691 (7th Cir. 1994))

In addition, when the ALJ has discounted the claimant's description of pain because it was inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p at *2. *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872).

In describing Avila's RFC, the ALJ accounted for Avila's testimony regarding her condition by assigning an RFC limited to a range of light work. The ALJ discredited Avila's testimony that she was incapable of *any* work. In support, the ALJ built the required logical bridge to her conclusion by citing to evidence that contradicted Avila's complaints of disabling pain. In her opinion, the ALJ pointed out that Avila's testimony described daily activities beyond those which would be reasonably expected given the complaints of disability symptoms. Furthermore, Avila

admitted that she was able to manage her pain with over-the-counter Advil and Tylenol P.M. Contrary to Avila's contentions, the ALJ acknowledged the alleged side effects from narcotic pain medication but concluded, as reflected within the record, that the side effects were mild and would not significantly interfere with Avila's ability to perform work. Moreover, the ALJ noted that the clinical findings of various treating physicians indicated conditions much milder than those alleged by Avila, and reasonably relied on the comparable testimony of the medical expert, Dr. Martin.

Finally, the ALJ described her personal observations of Avila during the hearing, stating that Avila was able to rise from her chair and to lift a large purse from the floor while leaning over the arm of her chair without difficulty. Ultimately, the ALJ shaped the RFC to reflect her consideration of Avila's testimony regarding her sit/stand limitations by adding to the RFC a provision that she must be allowed to change positions or alternate between sitting and standing every hour.

Avila further argues that the ALJ ignored evidence that she occasionally used a cane for stability and was required to rest in a reclined position throughout the day, and that the ALJ improperly disregarded her testimony pertaining to the method in which she accomplished her daily tasks. Although Avila scatters

these assertions of error throughout her brief, they are all, essentially, challenges to the ALJ's credibility determination. Avila has offered no evidence to show that the ALJ's determination of the credibility of her testimony was "patently wrong" as she must for reversal.  *Powers*, 207 F.3d at 435.  Particularly, as described within her own testimony, Avila's daily activities reasonably could be construed as inconsistent with her claim that she was unable to perform light work, even if those activities were accompanied by pain.

The ALJ's opinion adequately explained that she considered all of the evidence with regard to Avila's complaints and limitations, but based on her review of the entire case record, specifically the clinical findings, Avila's own testimony, and the ALJ's personal observations of Avila at the hearing, found Avila's statements to be less than credible. Accordingly, the ALJ sufficiently documented her credibility determination.  The findings of the ALJ are supported by substantial evidence, and as such, her determination is **AFFIRMED.**

ENTERED this 15th day of November, 2012


s/ Andrew P. Rodovich
United States Magistrate Judge